UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AMAZON.COM INC. et al.,

Plaintiffs,

v.

INDIVIDUALS AND ENTITIES et al.,

Defendants.

CASE NO. 2:22-cv-00757-TL

ORDER ON MOTION FOR DEFAULT JUDGMENT

This is an action for damages and injunctive relief for trademark infringement and related claims involving FURminator-branded pet-care tools. This matter is before the Court on a motion for default judgment and permanent injunction filed by Plaintiffs Amazon.com, Inc. and Amazon.com Services LLC (together, "Amazon Plaintiffs") and Spectrum Brands ("Spectrum") Dkt. No. 97. Over the pendency of this case, numerous named defendants have been dismissed. *See* Dkt. Nos. 55 (dismissing Bulent Arik, Can Balamur, Fatih Cosar, Beyzade Deniz, Does 1–10, Ferize Gokkaya, Yinteng Lin, Ayfer Sarac, Xinghua Xue, Erdem Akdemir, and Yusuf Altunel), 67 (Mehmet Ayaz), 86 (Erhan Koca), 88 (Denize Dilber), 90 (Mahmut Ozbek), 92

(Neslihan Kuslu), 104 (Emrah Kuslu). The remaining Defendants have neither appeared nor responded to Plaintiffs' motion. Having reviewed the relevant record, the Court GRANTS the motion.

## I. BACKGROUND

This case is one of many "brought by Amazon.com, Inc. and Amazon.com Services, LLC, together with other intellectual property owners, against third parties allegedly facilitating the sale of counterfeit products in the Amazon.com store." General Order No. 03-23 at 1 (W.D. Wash. Mar. 7, 2023). The cases are referred to collectively as the "Counterfeit Enforcement Actions." *Id.*

The instant motion is the latest in a series of motions for default judgment by Amazon Plaintiffs and/or its selling partners that have been handled by courts in this District, including at least three motions decided by this Court. *See Amazon.com, Inc. v. Li*, No. C21-1512 et al., 2024 WL 1832466 (W.D. Wash. Apr. 26, 2024); *Amazon Techs. Inc. v. Qiang*, No. C23-1060, 2024 WL 1606109 (W.D. Wash. Apr. 12, 2024); *Amazon.com, Inc. v. Dong*, No. C23-159, 2024 WL 775900 (W.D. Wash. Feb. 26, 2024); *see also, e.g.*, *Amazon.com Inc. v. BAMB AWNS*, No. C22-402, 2024 WL 3276352 (W.D. Wash. July 2, 2024) (Evanson, J.); *Amazon.com Inc. v. Zhi*, No. C20-1215, 2024 WL 943465 (W.D. Wash. Mar. 4, 2024) (Cartwright, J.); *Amazon.com, Inc. v. Wong*, No. C19-990, 2024 WL 553695 (W.D. Wash. Feb. 12, 2024) (Robart, J.); *Amazon.com, Inc. v. Dai*, No. C21-170, 2023 WL 6233835 (W.D. Wash. Sept. 26, 2023) (Martinez, J.); *Amazon.com, Inc. v. Sirowl Tech.*, No. C20-1217, 2022 WL 19000499 (W.D. Wash. Oct. 3, 2022) (Lasnik, J.); *Amazon.com, Inc. v. White*, No. C20-1773, 2022 WL 1641423 (W.D. Wash. May 24, 2022) (Chun, J.); *Amazon.com v. Kurth*, No. C18-353, 2019 WL 3426064 (W.D. Wash. July 30, 2019) (Jones, J.).

**A. The Plaintiffs**

Plaintiff Amazon.com, Inc. ("Amazon.com") is a Delaware corporation with its principal place of business in Seattle, Washington. Dkt. No. 46 (Third Amended Complaint ("TAC")) ¶ 7. Plaintiff Amazon.com Services LLC ("Amazon Services") is a Delaware company with its principal place of business in Seattle, Washington. *Id.* Amazon Plaintiffs own and operate the Amazon.com store (the "Amazon Store") and equivalent counterpart international stores and websites. *Id.* ¶ 2. Some products in the Amazon Store are sold directly by Amazon Plaintiffs, while others are sold by its third-party selling partners. *Id.*

Plaintiff Spectrum is a New York limited liability company ("LLC") with its principal place of business in Earth City, Missouri. *Id.* ¶ 8. Plaintiff Spectrum develops, manufactures, and sells a variety of pet-care products, among other consumer product goods, including the "FURminator," which it describes as a "patented deshedding solution." *Id.* ¶ 3. Plaintiff Spectrum owns the following registered trademarks (the "Spectrum Trademarks"): (1) FURMINATOR, Registration No. 2,965,342 (IC 3, 21); (2) FURminator, Registration No. 3,238,141 (IC 3, 21); (3) FUREJECTOR, Registration No. 5,722,436 (IC 21); and (4) a graphic of a stylized pawprint consisting of a triangle with rounded corners and four ovals arrayed around it, Registration No. 3,544,400 (IC 3, 21, 31). *Id.* ¶ 4; *see also* Dkt. No. 46-1 at 2–5 (trademark registers from United States Patent and Trademark Office).

**B. The Allegations**

**1. The Amazon Store**

At various times between August 2020 and August 2022, Defendants controlled and operated various selling accounts in the Amazon Store. Dkt. No. 46 ¶ 28; *see also id.* at 22–47 (Schedules 1A, 1B, and 2 detailing selling accounts). To become a third-party seller in the Amazon Store, sellers are required to agree to the Amazon Services Business Solutions

Agreement ("BSA"), which governs the seller's access to and use of Amazon Plaintiffs' services and states Amazon Plaintiffs' rules for selling in the Amazon Store. *Id.* ¶ 29. By entering into the BSA, each seller represents and warrants that it "will comply with all applicable Laws in [the] performance of its obligations and exercise of its rights" under the BSA. *Id.*; *see also* Dkt. No. 46-2 (BSA).

Under the terms of the BSA, Amazon Plaintiffs identify the sale of counterfeit goods as "deceptive, fraudulent, or illegal activity" in violation of its policies, reserving the right to withhold payments and terminate the selling account of any bad actor who engages in such conduct. Dkt. No. 46 ¶ 30. The BSA requires the seller to defend, indemnify, and hold harmless Amazon Plaintiffs against any claims or losses arising from the seller's "actual or alleged infringement of any Intellectual Property Rights." *Id.*

The BSA also incorporates Amazon Plaintiffs' Anti-Counterfeiting Policy, which expressly prohibits the sale of counterfeit goods in the Amazon Store and describes Amazon Plaintiffs' commitment to preventing the sale and distribution of counterfeit goods in the Amazon Store as well as the consequences of doing so. *Id.* ¶¶ 31–32; *see also* Dkt. No. 46-3 at 2–3 (Amazon Anti-Counterfeiting Policy).

Finally, under the BSA, sellers agree that the information and documentation they provide to Amazon Plaintiffs in connection with their selling accounts—such as identification, contact, and banking information—will be valid, truthful, accurate, and complete. Dkt. No. 46 ¶ 33.

**2. Defendants' Selling Accounts**

Plaintiff Spectrum conducted test purchases of FURminator-branded products sold by Defendants through the selling accounts and determined that: (1) the products are inauthentic; (2) the products bear counterfeit FURminator trademarks; and (3) Spectrum brands never

authorized the sale of such products. *Id.* ¶ 36; *see id.* at 22–47 (Schedules 1A, 1B, and 2 detailing confirmation of counterfeit products from Defendants' selling accounts). Plaintiff Spectrum confirmed that the products are counterfeit based on "deviations from Spectrum Brands' authentic product and packaging." *Id.* at 22–47. Deviations included "stor[age] in substandard packaging"; "color[] using a pigment different than that used in genuine FURminator-branded products"; "markings not used on genuine FURminator-branded products"; and "inferior quality." Dkt. No. 100 (Moody Decl.) ¶ 5. Plaintiffs also assert that Defendants "knowingly and willfully used Spectrum Brands' IP in connection with the advertising, marketing, distributing, offering for sale, and selling of counterfeit Spectrum Brands products." Dkt. No. 46 ¶ 38.

Defendant Ali Akdogan controlled and operated the LeytonBridge selling account. *See* Dkt. No. 46 at 22. The LeytonBridge account made $26,704 in counterfeit sales and issued $21,628 in adjusted refunds.[1] Dkt. No. 99 (Haskel Decl. (sales and refunds chart)) at 5.

Defendant Gulcan Akdogan controlled and operated the Kensington LLC selling account. *See* Dkt. No. 46 at 22. The Kensington LLC account made $10,984 in counterfeit sales and issued $8,601 in adjusted refunds. Dkt. No. 99 at 5.

Defendant Emir Alkan controlled and operated the EMIR ALKAN34 selling account. *See* Dkt. No. 46 at 23. The EMIR ALKAN34 account made $1,092 in counterfeit sales and issued $0 in adjusted refunds. Dkt. No. 99 at 5.

//

//

[1] Per the Haskell Declaration, "'Adjusted Refunds Issued' refers to the total amount of refunds issued by Amazon, less any funds that Amazon recovered from Defendants' sale proceeds or credit cards on file." Dkt. No. 99 at 5; *id.* ¶ 5.

Defendant Ismael Arslan controlled and operated the LION'S TRADE selling account. *See* Dkt. No. 46 at 24. The LION'S TRADE account made $4,666 in counterfeit sales and issued $0 in adjusted refunds. Dkt. No. 99 at 5.

Defendant Levent Arik controlled and operated the PuppyParadise selling account. *See* Dkt. No. 46 at 24. The PuppyParadise account made $344,703 in counterfeit sales and issued $270,301 in adjusted refunds. Dkt. No. 99 at 5.

Defendant Sahin Balut controlled and operated the LUXINGA and Melidia selling accounts. *See* Dkt. No. 46 at 25–26. The LUXINGA account made $95,292 in counterfeit sales and issued $66,389 in adjusted refunds. Dkt. No. 99 at 5. The Melidia account made $16,703 in counterfeit sales and issued $2,231 in adjusted refunds. *Id.*

Defendant Enes Cankaya controlled and operated the Deals Center selling account. *See* Dkt. No. 46 at 26. The Deals Center account made $28,548 in counterfeit sales and issued $0 in adjusted refunds. Dkt. No. 99 at 5.

Defendant Murat Demir controlled and operated the FOMGLOBAL LTD selling account. *See* Dkt. No. 46 at 27. The FOMGLOBAL LTD account made $10,806 in counterfeit sales and issued $2,049 in adjusted refunds. Dkt. No. 99 at 5.

Defendant Fahriye Hascelik controlled and operated the TREXPO selling account. *See* Dkt. No. 46 at 28. The TREXPO account made $7,060 in counterfeit sales and issued $5,323 in adjusted refunds. Dkt. No. 99 at 5.

Defendant Hamidbek Jumabayev controlled and operated the HAMMI-US selling account. *See* Dkt. No. 46 at 29. The HAMMI-US account made $4,748 in counterfeit sales and issued $3,176 in adjusted refunds. Dkt. No. 99 at 5.

Defendant Ibrahim Karakaya controlled and operated the KKBR selling account. *See* Dkt. No. 46 at 29. The KKBR account made $5,155 in counterfeit sales and issued $0 in adjusted refunds. Dkt. No. 99 at 5.

Defendant Adem Omer Yilmaz controlled and operated the GUIDERS selling account. *See* Dkt. No. 46 at 31. The GUIDERS account made $9,774 in counterfeit sales and issued $0 in adjusted refunds. Dkt. No. 99 at 5.

Defendant Seyfihan Sahin controlled and operated the SAHIN LTD selling account. *See* Dkt. No. 46 at 32. The SAHIN LTD account made $6,697 in counterfeit sales and issued $4,990 in adjusted refunds. Dkt. No. 99 at 5.

Defendant Mustafa Unver controlled and operated the M & M Store selling account. *See* Dkt. No. 46 at 32. The M & M Store account made $5,975 in counterfeit sales and issued $3,995 in adjusted refunds. Dkt. No. 99 at 6.

Defendant Tarik Acar controlled and operated the RYA Store selling account. *See* Dkt. No. 46 at 33. The RYA Store account made $9,396 in counterfeit sales and issued $4,641 in adjusted refunds. Dkt. No. 99 at 6.

Defendant Murat Bayram controlled and operated the UTAHRAPTOR selling account. *See* Dkt. No. 46 at 34. The UTAHRAPTOR account made $57,468 in counterfeit sales and issued $40,415 in adjusted refunds. Dkt. No. 99 at 6.

Defendant Muhammad Fatih Buyukyildiz controlled and operated the OUR STAR STORE selling account. *See* Dkt. No. 46 at 35. The OUR STAR STORE account made $187,712 in counterfeit sales and issued $0 in adjusted refunds. Dkt. No. 99 at 6.

Defendant Botan Cevarun controlled and operated the Saint-Benoît selling account. *See* Dkt. No. 46 at 35. The Saint-Benoît account made $1,218 in counterfeit sales and issued $666 in adjusted refunds. Dkt. No. 99 at 6.

Defendant Ferhat Demir controlled and operated the SWIPE-X selling account. *See* Dkt. No. 46 at 36. The SWIPE-X account made $61,556 in counterfeit sales and issued $41,489 in adjusted refunds. Dkt. No. 99 at 6.

Defendant Barbaros Kambak controlled and operated the My Little Pet selling account. *See* Dkt. No. 46 at 37. The My Little Pet account made $25,848 in counterfeit sales and issued $0 in adjusted refunds. Dkt. No. 99 at 6.

Defendants Yasemin Ozturk and Ali Burak Ozturk jointly controlled and operated the Olexy LLC selling account. *See* Dkt. No. 46 at 38. The Olexy LLC account made $15,449 in counterfeit sales and issued $1,486 in adjusted refunds. Dkt. No. 99 at 6.

Defendant Emir Safa Yolcu controlled and operated the YOLCU EXPRES selling account. *See* Dkt. No. 46 at 38. The YOLCU EXPRESS account made $7,090 in counterfeit sales and issued $2,731 in adjusted refunds. Dkt. No. 99 at 6.

Defendants Deniz Senel and Nuri Senel jointly controlled and operated the Comepanya selling account. *See* Dkt. No. 46 at 39. The Comepanya account made $134,168 in counterfeit sales and issued $98,338 in adjusted refunds. Dkt. No. 99 at 6.

Defendant Ozkan Yenihayat controlled and operated the NEW LIFE LLC selling account. *See* Dkt. No. 46 at 40. The NEW LIFE LLC account made $5,748 in counterfeit sales and issued $688 in adjusted refunds. Dkt. No. 99 at 6.

Defendant Baris Cicek controlled and operated the CHARLIE LLC selling account. *See* Dkt. No. 46 at 36. The CHARLIE LLC account made $19,073 in counterfeit sales and issued $11,358 in adjusted refunds. Dkt. No. 99 at 6.

Defendant Yinglan Lin controlled and operated the Andrew Gaines, Brandon McCaughey, Cara Luman, Charles K Berrett, Fred,P Leveque, Laurie Brock, Meredith C Madigan, Moises Ramirez, Teresa Ann Sifford, Timothy Johnson, Tosha T Johnson, and Virgil

C. Thomas selling accounts. *See* Dkt. No. 46 at 41–45. The Andrew Gaines account made $2,321 in counterfeit sales and issued $755 in adjusted refunds. Dkt. No. 99 at 7. The Brandon McCaughey account made $4,352 in counterfeit sales and issued $1,837 in adjusted refunds. *Id.* The Cara Luman account made $1,602 in counterfeit sales and issued $0 in adjusted refunds. *Id.* The Charles K Berrett account made $2,836 in counterfeit sales and issued $1,353 in adjusted refunds. *Id.* The Fred,P Leveque account made $6,320 in counterfeit sales and issued $4,302 in adjusted refunds. *Id.* The Laurie Brock account made $7,861 in counterfeit sales and issued $2,179 in adjusted refunds. *Id.* The Meredith C Madigan account made $1,325 in counterfeit sales and issued $488 in adjusted refunds. *Id.* The Moises Ramirez account made $1,905 in counterfeit sales and issued $640 in adjusted refunds. *Id.* The Teresa Ann Sifford account made $2,706 in counterfeit sales and issued $2,225 in adjusted refunds. *Id.* The Timothy Johnson account made $75 in counterfeit sales and issued $49 in adjusted refunds. *Id.* The Tosha T Johnson account made $1,087 in counterfeit sales and issued $625 in adjusted refunds. *Id.* The Virgil C. Tomas account made $7,066 in counterfeit sales and issued $5,700 in adjusted refunds. *Id.*

Defendant Emrah Altinay controlled and operated the EAquality selling account. *See* Dkt. No. 46 at 23. The EAquality account made $27,042 in counterfeit sales and issued $19,010 in adjusted refunds. Dkt. No. 99 at 7.

Defendant Mete Mokan controlled and operated the MMMN Co. selling account. *See* Dkt. No. 46 at 31. The MMMN Co. account made $145,480 in counterfeit sales and issued $114,430 in adjusted refunds. Dkt. No. 99 at 7.

Defendant Enes Karatas controlled and operated the Karatass selling account. *See* Dkt. No. 46 at 29. The Karatass account made $4,771 in counterfeit sales and issued $0 in adjusted refunds. Dkt. No. 99 at 7.

Defendant Emre Unver controlled and operated the EMRE' STORY selling account. *See* Dkt. No. 46 at 40. The EMRE' STORY account made $17,337 in counterfeit sales and issued $11,373 in adjusted refunds. Dkt. No. 99 at 7.

Defendant Huseyin Ayaz controlled and operated the Dimple Beauty LLC selling account. *See* Dkt. No. 46 at 34. The Dimple Beauty LLC account made $3,089 in counterfeit sales and issued $102 in adjusted refunds. Dkt. No. 99 at 7.

Defendant Mucahit Kaya controlled and operated the MFM Global selling account. *See* Dkt. No. 46 at 37. The MFM Global account made $10,185 in counterfeit sales and issued $0 in adjusted refunds. Dkt. No. 99 at 7.

After Amazon Plaintiffs confirmed the counterfeit sales, they blocked the selling accounts. Dkt. No. 46 ¶ 40. Amazon Plaintiffs also issued refunds to all customers who purchased counterfeit FURminator-branded products sold by Defendants. Dkt. No. 99 ¶ 5. After accounting for any funds recovered from Defendants' sales proceeds or from Defendants' credit cards on file, Amazon Plaintiffs incurred a total of $755,563 in damages in issuing the refunds. *Id.*

**C. Procedural History**

Given the number of Defendants and their geographical scope, this case has a complex procedural background. The Court has divided the narrative into five rough categories: initial pleadings, service of process, responsive pleadings, defaults, and dismissals. Some of the events in these categories overlap chronologically.

**1. Initial Pleadings**

On May 31, 2022, Plaintiffs initiated this action against those Defendants identified in Schedules 1A and 1B. Dkt. No. 1 (complaint). That same day, Plaintiffs initiated a related action against those Defendants identified in Schedule 2. *See* Complaint, *Amazon.com Inc. v.*

*Individuals & Entities*, No. C22-758 (W.D. Wash. May 31, 2022), Dkt. No. 1. On September 29, 2022, Plaintiffs filed an amended complaint in this case. Dkt. No. 12. On November 3, 2022, the Honorable Brian A. Tsuchida, United States Magistrate Judge, ordered the two cases consolidated, and the consolidated case proceeded as No. C22-757. Dkt. No. 13 (Order to Consolidate).

On November 17, 2022, the cases having been consolidated, Plaintiffs filed a second amended complaint ("SAC"). Dkt. No. 14. After multiple orders related to the timing of discovery (*see* Dkt. Nos. 25, 32, 34, 37, 40), on April 15, 2024, Plaintiffs sought the Court's leave to file a third amended complaint ("TAC") (Dkt. No. 41), which the Court granted the same day (Dkt. No. 44). On April 16, 2024, Plaintiffs filed the TAC. Dkt. No. 46.

**2. Service**

On May 13, 2024, Plaintiffs served Defendant Ismail Arslan. Dkt. No. 48 (affidavit of service).

On May 30, 2024, Plaintiffs served Defendant Levent Arik. Dkt. No. 49 (affidavit of service).

On August 19, 2024, the Court granted Plaintiffs' *ex parte* motion for alternative service. Dkt. No. 59. The Court authorized Plaintiffs to serve the following 35 Defendants via email: Tarik Acar, Ali Akdogan, Gulcan Akdogan, Emir Alkan, Mehmet Ayaz, Huseyin Ayaz, Murat Bayram, Sahin Balut, Muhammad Fatih Byukyildiz, Enes Cankaya, Botan Cevarun, Baris Cicek, Ferhat Demir, Murat Demir, Deinze Dilber, Fahriye Hascelik, Hamidbek Jumabayev, Barbaros Kambak, Ibrahim Karakaya, Mucahit Kaya, Erhan Koca, Emrah Kuslu, Neslihan Kuslu, Yinglan Lin, Mahmut Ozbek, Ali Burak Ozturk, Yasemin Ozturk, Seyfihan Sahin, Deniz Senel, Osman Nuri Senel, Emre Unver, Mustafa Unver, Ozkan Yenihayat, Adem Omer Yilmaz, and Emir Safa Yolcu. *Id.* at 1–3.

On August 22, 2024, Plaintiffs served these same 35 Defendants via email. *See* Dkt. No. 64 (affidavit of service).

On October 19, 2024, Plaintiffs served Defendant Enes Karatas. Dkt. No. 73 (affidavit of service).

On October 21, 2024, Plaintiffs served Defendant Mete Mokan. Dkt. No. 74 (affidavit of service).

On October 28, 2024, Plaintiffs served Defendant Emrah Altinay. Dkt. No. 72 (affidavit of service).

**3. Responsive Pleadings**

On August 28, 2024, Defendants Neslihan Kuslu and Emrah Kuslu answered the TAC. Dkt. Nos. 62 (N. Kuslu Answer), 63 (E. Kuslu Answer).

On September 11, 2024, Defendant Mahmut Ozbek answered the TAC. Dkt. No. 66 (Ozbek Answer).

On September 16, 2024, Defendant Denize Dilber answered the TAC. Dkt. No. 68 (Dilber Answer).

On September 16, 2024, Defendant Erhan Koca answered the TAC. Dkt. No. 69.

**4. Default**

On February 10, 2025, Plaintiffs moved for an entry of default against the following 31 Defendants: Ali Akdogan, Gulcan Akdogan, Emir Alkan, Sahin Balut, Enes Cankaya, Murat Demir, Fehriye Hascelik, Hamidbek Jumabayev, Ibrahim Karakaya, Adem Omer Yilmaz, Seyfihan Sahin, Mustafa Unver, Tarik Acar, Murat Bayram, Muhammed Fatih Buyukyildiz, Botan Cevarun, Ferhat Demir, Barbaros Kambak, Yasemin Ozturk, Ali Burak Ozturk, Emir Safa Yolcu, Denize Senel, Osman Nuri Senel, Ozkan Yenihayat, Baris Cicek, Levent Arik, Ismail Arlsan, Yinglan Lin, Emrah Altinay, Mete Mokan, and Enes Karatas. Dkt. No. 75 at 1. On

February 12, 2025, the Court granted the motion and entered those Defendants into default. Dkt. No. 77.

On May 28, 2025, Plaintiffs filed a motion for entry of default against Defendant Emre Unver. Dkt. No. 82 at 1. On June 5, 2025, the Court granted the motion and entered Defendant Emre Unver into default. Dkt. No. 84.

On March 3, 2026, Plaintiffs filed a motion for entry of default against Defendants Huseyin Ayaz and Mucahit Kaya. Dkt. No. 93. On March 10, 2026, the Court granted the motion and entered these Defendants into default. Dkt. No. 94.

**5. Dismissals**

On August 16, 2024, claims against Defendants Bulent Arik, Can Balamur, Fatih Cosar, Beyzade Deniz, Does 1–10, Ferize Gokkaya, Yinteng Lin, Ayfer Sarac, Xinghua Xue, Erdem Akdemir, and Yusuf Altunel were dismissed without prejudice. Dkt. No. 55.

On September 11, 2024, claims against Defendant Mehmet Ayaz was dismissed without prejudice. Dkt. No. 67.

On June 13, 2025, claims against Defendant Erhan Koca were dismissed with prejudice. Dkt. No. 86.

On July 24, 2025, claims against Defendant Denize Dilber were dismissed with prejudice. Dkt. No. 88.

On August 14, 2025, claims against Defendant Mahmut Ozbek were dismissed with prejudice. Dkt. No. 90.

On November 17, 2025, claims against Defendant Neslihan Kuslu were dismissed with prejudice. Dkt. No. 92.

On April 29, 2026, claims against Defendant Emrah Kuslu was dismissed with prejudice. Dkt. No. 104.

* * *

On April 9, 2026, Plaintiffs filed the instant motion for default judgment against 34 Defendants (the "remaining Defendants"): Ali Akdogan, Gulcan Akdogan, Emir Alkan, Ismail Arslan, Levent Arik, Sahin Balut, Enes Cankaya, Murat Demir, Fahriye Hascelik, Hamidbek Jumabayev, Ibrahim Karakaya, Adem Omer Yilmaz, Seyfihan Sahin, Mustafa Unver, Tarik Acar, Murat Bayram, Muhammed Fatih Buyukyildiz, Botan Cevarun, Ferhat Demir, Barbaros Kambak, Yasemin Ozturk, Ali Burak Ozturk, Emir Safa Yolcu, Deniz Senel, Osman Nuri Senel, Ozkan Yenihayat, Baris Cicek, Yinglan Lin, Emrah Altinay, Mete Mokan, Enes Karatas, Emre Unver, Huseyin Ayaz, and Mucahit Kaya. Dkt. No. 97 at 8–9. Plaintiffs aver that they have "voluntarily dismissed all other defendants from this action." *Id.* at 9 n.1 (citing Dkt. Nos. 55, 67, 85, 87, 89, 91, 94).

## II. Legal Standard

A court's decision to enter a default judgment is discretionary. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Default judgment is "ordinarily disfavored," because courts prefer to decide "cases on their merits whenever reasonably possible." *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986) (affirming district court's denial of default judgment). When considering whether to exercise discretion in entering default judgments, courts may consider a variety of factors, including:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of a plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure.

*Id.* at 1471–72. Courts reviewing motions for default judgment must accept the allegations in the complaint as true, except facts related to the amount of damages. *Geddes v. United Fin. Grp.*,

559 F.2d 557, 560 (9th Cir. 1977). "However, necessary facts not contained in the pleadings, and the claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992); *accord Little v. Edward Wolff & Assocs. LLC*, No. C21-227, 2023 WL 6196863, at *3 (W.D. Wash. Sept. 22, 2023) (quoting *Cripps*). Damages are also limited to what was reasonably pleaded. Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.").

## III. Discussion

### A. Jurisdiction

As an initial matter, the Court "has an affirmative duty to look into its jurisdiction over both the subject matter and the parties." *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).

#### 1. Subject Matter Jurisdiction

The Court finds that it has subject matter jurisdiction in this matter based on Plaintiffs' claims for trademark counterfeiting and infringement and false designation of origin. 15 U.S.C. § 1121(a); 28 U.S.C. §§ 1331, 1338. The Court also finds that it has supplemental jurisdiction over Plaintiffs' claims under the Washington Consumer Protection Act ("WCPA") and Plaintiff Amazon Services' breach of contract claim. 28 U.S.C. §§ 1332, 1367.

#### 2. Personal Jurisdiction

Washington's long-arm statute is coextensive with the reach of federal due process. RCW 4.28.180. Therefore, to exercise personal jurisdiction over a nonresident defendant, the defendant need only have "certain minimum contacts" with the relevant forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). This means a "defendant's conduct and connection with the forum State must be such that the defendant

should reasonably anticipate being haled into court there." *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990) (internal quotation marks and citation omitted).

Accepting the allegations as true, the Court finds that it has personal jurisdiction over Defendants. First, the BSA includes a forum-selection clause under which Defendants agreed to litigate claims "related to [their] sale of counterfeit products on the Amazon Site" in "the state or Federal court in King County, Washington[.]" Dkt. No. 46-2 at 9, 13, 42, 45. "This alone satisfies the Court that it has personal jurisdiction" *Amazon.com, Inc. v. Nyutu*, No. C23-1681, 2025 WL 990483, at *2 (W.D. Wash. Apr. 2, 2025). Second, Defendants "affirmatively undertook to do business with Amazon [Plaintiffs], a corporation with its principal place of business in Washington, and sold in the Amazon Store products bearing counterfeit versions of the FURminator Trademarks and which otherwise infringed Spectrum Brands' IP." Dkt. No. 46 ¶ 12. In other words, Defendants "transacted business using a Washington state company as its sales platform [and] reached out to do business with Washington residents through that platform[.]" *Li*, 2024 WL 1832466, at *4 (quoting *Wong*, 2024 WL 553695, at *2); *accord, e.g.*, *Sirowl Tech.*, 2022 WL 19000499, at *1. "Plaintiffs' claims arose from these contacts with Washington state." *Id.* (quoting *Wong*, 2024 WL 553695, at *2). Defendants also "entered into an ongoing contractual relationship with a Washington State company . . . and then violated that contractual relationship." *Id.* (quoting *Dai*, 2023 WL 6233835, at *2).[2]

**B. Propriety of Default Judgment**

Considering the *Eitel* factors, the Court finds that entry of default judgment is proper.

[2] The Court thus need not reach Plaintiffs' alternative basis for personal jurisdiction: the presence of a forum selection clause in the BSA. *See* Dkt. No. 46 ¶ 13; Dkt. No. 97 at 10.

**1. Factor One: Prejudice to Plaintiffs**

Without entry of default judgment, Plaintiffs will be prejudiced. Plaintiffs have attempted to litigate this case and vindicate their rights under federal and state law against Defendants. But Defendants have failed to appear or participate in this litigation despite being personally served. "Without default judgment, Plaintiffs will suffer prejudice because they will be denied the right to judicial resolution of their claims and will be without other recourse for recovery." *Li,* 2024 WL 1832466, at *4 (quoting *Wong*, 2024 WL 553695, at *3) (internal quotation marks omitted). This factor favors entry of default judgment.

**2. Factors Two and Three: Merits of Plaintiffs' Claims and Sufficiency of Complaint**

As an initial matter, Amazon Plaintiffs agree to voluntarily dismiss their claims for false advertising. *See* Dkt. No. 97 at 13 n.5. Therefore, these claims are DISMISSED.

Taking the remaining allegations in the complaints as true, Plaintiffs have sufficiently pleaded potentially meritorious claims. *See PepsiCo, Inc. v. Calif. Sec'y Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002) (explaining how the Ninth Circuit has suggested that these two *Eitel* factors require plaintiffs to state a claim on which they can recover). The Court reviews each claim in turn.

**a. Trademark Counterfeiting and Infringement**

Plaintiff Spectrum brings a claim for trademark counterfeiting and infringement against all Defendants. Dkt. No. 46 ¶¶ 41–47. To prevail on a claim for trademark infringement under 15 U.S.C. § 1114, Plaintiff Spectrum must show that Defendants used:

> (1) a reproduction, counterfeit, copy or colorable imitation of [its] registered trademark, (2) without its consent, (3) in commerce, (4) in connection with the sale, offering for sale, distribution or advertising of any goods, (5) where such use is likely to cause confusion, or to cause a mistake or to deceive.

*Li*, 2024 WL 1832466, at *5 (quoting *Wong*, 2024 WL 553695, at *4). "Likelihood of confusion exists when consumers viewing the mark would probably assume that the goods it represents are associated with the source of a different product identified by a similar mark." *Wong*, 2024 WL 553695, at *4 (quoting *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 608 (9th Cir. 2005)). Courts generally evaluate eight factors to determine whether confusion is likely:

> 1) the strength of the mark; 2) proximity or relatedness of the goods; 3) the similarity of the marks; 4) evidence of actual confusion; 5) the marketing channels used; 6) the degree of care customers are likely to exercise in purchasing the goods; 7) the defendant's intent in selecting the mark; and 8) the likelihood of expansion into other markets.

*KP Permanent Make-Up*, 408 F.3d at 608 (citing *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)). "Where a defendant uses a counterfeit mark, however, courts both within and outside the Ninth Circuit presume a likelihood of consumer confusion." *Wong*, 2024 WL 553695, at *4 (citing *Coach, Inc. v. Pegasus Theater Shops*, No. C12-1631, 2013 WL 5406220, at *3 (W.D. Wash. Sept. 25, 2013) (compiling cases)). A "counterfeit" is "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.

Here, Plaintiff Spectrum alleges that it owns the Spectrum Trademarks. Dkt. No. 46 ¶ 43; *see also* Dkt. No. 46-1 at 2–5. Defendants advertised, marketed, offered, distributed, and sold products bearing counterfeit and infringing versions of the Spectrum Trademarks. Dkt. No. 46 ¶¶ 28, 36, 45.; *id.* at 22–47 (identifying selling accounts operated by Defendants and describing review of the products sold by them). Accepting these allegations as true, the Court finds that it is likely that a reasonable consumer would confuse the products sold through Defendants' selling accounts in the Amazon Store with genuine Spectrum products. Therefore, Plaintiff Spectrum

has stated a claim against all Defendants for trademark counterfeiting and infringement in violation of 15 U.S.C. § 1114(a), and the second and third *Eitel* factors weigh in favor of entry of default judgment on this claim.

**b. False Designation of Origin**

Plaintiff Spectrum and Amazon Plaintiffs bring claims for false designation of origin under 15 U.S.C. § 1125(a)(1)(A) against all Defendants. Dkt. No. 46 ¶¶ 48–56 (Spectrum), 57–64 (Amazon). To state a claim for false designation of origin, each Plaintiff must allege that Defendants "(1) used in commerce (2) any word, false designation of origin, false or misleading description, or representation of fact, which (3) is likely to cause confusion or mistake, or to deceive, as to sponsorship, affiliation, or the origin of the goods or services in question." *Li*, 2024 WL 1832466, at *6 (quoting *Wong*, 2024 WL 553695, at *5). "Although [Plaintiff Spectrum] is the trademark holder in this case and not Amazon.com, under § 1125(a), '"any person who believes that he or she is likely to be damaged" by a defendant's false advertising' may sue." *Dai*, 2023 WL 6233835, at *3 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014)).

(1) Plaintiff Spectrum

Here, Plaintiff Spectrum alleges that Defendants sold counterfeit Spectrum products bearing the Spectrum Trademarks. Dkt. No. 46 ¶¶ 5, 28, 51–52. This unauthorized misuse of the Spectrum Trademarks deceived customers into believing that the products were authentic when they were counterfeit. *Id.* ¶ 52. This misuse also wrongfully trades on Plaintiff Spectrum's goodwill and business reputation. *Id.* Therefore, Plaintiff Spectrum has stated a claim for false designation of origin. *See Li*, 2024 WL 1832466, at *6 (holding the same); *Wong*, 2024 553695, at *5 (same); *White*, 2022 WL 1641423, at *3 (same).

(2) Amazon Plaintiffs

Here, Amazon Plaintiffs allege that Defendants deceived them about the authenticity of the products they were advertising, marketing, offering, distributing, and selling, in violation of the BSA and Amazon's Anti-Counterfeiting Policies. Dkt. No. 46 ¶ 59; *see also id.* ¶¶ 16–24 (describing Amazon Plaintiffs' efforts to address the sale of counterfeit goods in their stores). Defendants' acts undermine and jeopardize consumer trust in Amazon Plaintiffs and the Amazon Store. *Id.* ¶ 62. Therefore, Amazon Plaintiffs have stated a claim for false designation of origin. *See Li*, 2024 WL 1832466, at *6 (holding the same); *Dai*, 2023 WL 6233835, at *3 (same); *Sirowl Tech.*, 2022 WL 19000499, at *3 (same).

**c. Violation of WCPA**

Plaintiff Spectrum and Amazon Plaintiffs bring a claim under the WCPA against all Defendants. Dkt. No. 46 ¶¶ 65–69. To state a claim under the WCPA, Plaintiffs must allege "(1) an unfair or deceptive act or practice; (2) occurring in the conduct of trade or commerce; (3) affecting the public interest; (4) injuring its business or property; and (5) a causal link between the unfair or deceptive act and the injury suffered." *Dai*, 2023 WL 6233835, at *4 (quoting *BBC Grp. NV LLC v. Island Life Rest. Grp. LLC*, No. C18-1011, 2020 WL 758070, at *2 (W.D. Wash. Feb. 14, 2020)). "Absent unusual circumstances, the analysis of a CPA claim will follow that of the [federal] trademark infringement and unfair competition claims; it will turn on the likelihood of confusion regarding a protectable mark." *Id.* (quoting *Safeworks, LLC v. Teupen Am., LLC*, 717 F. Supp. 2d 1181, 1192 (W.D. Wash. 2010)).

Here, "[b]ecause analysis of a CPA claim tracks that for a federal trademark claim, and there do not appear to be any unusual circumstances dictating a different result, Plaintiffs have already demonstrated the basis for their CPA claim." *Id.* Therefore, Plaintiffs have stated a claim under the WCPA.

**d. Breach of Contract**

Finally, Plaintiff Amazon Services brings a claim of breach of contract against all Defendants. Dkt. No. 46 ¶¶ 70–75. To state a claim for breach of contract, Amazon Services must show: "(1) the existence of a contractual duty, (2) breach, (3) causation, and (4) damages." *Kurth*, 2019 WL 3426064, at *3 (citing *Larson v. Union Inv. & Loan Co.*, 168 Wash. 5, 10 P.2d 557 (1932)).

Here, Plaintiff Amazon Services alleges that Defendants entered into the BSA, which incorporated by reference Amazon's Anti-Counterfeiting Policy, to which Defendants agreed to be bound. Dkt. No. 46 ¶ 71. Defendants materially breached the BSA and Anti-Counterfeiting Policy by selling and distributing counterfeit Spectrum products and by submitting falsified documents to Amazon Plaintiffs both to obtain initial approval to sell the products in the Amazon Store and to lift their later suspension. *Id.* ¶¶ 73–74. As a result, Amazon Plaintiffs suffered $755,563 in damages from issuing customer refunds. Dkt. No. 99 ¶ 5. Therefore, Plaintiff Amazon Services has stated a claim for breach of contract.

**3. Factor Four: Sum of Money at stake**

Given the substantial sums that are at stake and the seriousness of the alleged misconduct, this factor favors entry of default judgment. See *Curtis v. Illumination Arts, Inc.*, 33 F. Supp. 3d 1200, 1212 (W.D. Wash. 2014) (stating that this factor accounts for "the amount of money requested in relation to the seriousness of the defendant's conduct, whether large sums of money are involved, and whether the recovery sought is proportional to the harm caused by defendant's conduct") (internal citations and quotation omitted).

**4. Factor Five: Possibility of Dispute of Material Facts**

There is little possibility that the core, material facts are in dispute. "When default has been entered, courts find that there is no longer the possibility of a dispute concerning material

facts because the court must take the plaintiff's factual allegations as true." *Id*. Not only have Defendants failed to appear in this action, but Plaintiffs have provided detailed evidence in support of their claims that is likely difficult to be rebutted. There is no evidence suggesting a dispute could arise. This factor favors entry of default judgment.

**5. Factor Six: Whether Default Is Due to Excusable Neglect**

There is no evidence that the remaining Defendants' failure to appear is due to excusable neglect. Indeed, Plaintiffs provide evidence that shows the remaining Defendants were properly served yet have still failed to appear in this action. *See* Dkt. No. 16. This factor favors entry of default judgment.

**6. Factor Seven: Strong Policy in Favor of Decision on the Merits**

The Court maintains a strong policy preference in favor of resolution of Plaintiffs' claims on the merits. "Where, as here, a defendant fails to appear or defend itself in the action, however, the policy favoring decisions on the merits is not dispositive." *Li*, 2024 WL 1832466, at *7 (quoting *Dong*, 2024 WL 775900, at *7). The remaining Defendants' decision not to appear in this case vitiates against this policy. This factor favors entry of default judgment.

Therefore, Plaintiffs' motion for default judgment is GRANTED IN PART as to all claims but Amazon Plaintiffs' claim of false advertising, which is DISMISSED, and judgment will be ENTERED as to the remaining claims.

**C. Damages**

**1. Statutory Damages for Plaintiff Spectrum for Violation of the Lanham Act**

"Under the Lanham Act, a plaintiff may elect whether to recover its actual damages caused by the defendants' use of a counterfeit mark or statutory damages." *Li*, 2024 WL 1832466, at *8 (quoting *Dong*, 2024 WL 775900, at *7). A plaintiff may recover statutory damages of not less than $1,000 or more than $200,000 per infringed mark. 15 U.S.C.

§ 1117(c)(1). However, "[i]f the court finds that a defendant's use of a counterfeit mark was willful, it has discretion to award statutory damages of 'not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.'" *Wong*, 2024 WL 553695, at *7 (quoting 15 U.S.C. § 1117(c)(2)). "[S]tatutory damages may compensate the victim, penalize the wrongdoer, deter future wrongdoing, or serve all of those purposes." *Dong*, 2024 WL 775900, at *7 (quoting *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1008 (9th Cir. 2023)). "The plaintiff, however, 'is not entitled to a windfall.'" *Wong*, 2024 WL 553695, at *1 (quoting *Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1102 (N.D. Cal. 2014)). Because Plaintiff Spectrum has alleged the willful infringement of four Spectrum Trademarks (*see, e.g.*, Dkt. No. 46 ¶¶ 5, 45), the Court may award up to $8,000,000 in statutory damages.

Here, Plaintiff Spectrum has provided evidence that Defendants sold a total of at least $1,350,993 in aggregate sales. Dkt. No. 97 at 18; Dkt. No. 99 ¶ 3. As a result, Plaintiff Spectrum seeks a total of $4,052,979—or three times the aggregate sales — in statutory damages against Defendants. Dkt. No. 97 at 18; Dkt. No. 97-1 (proposed order) at 2–4.

The Court finds that Plaintiff Spectrum's request is appropriate and just. Each Defendant engaged in an intentional and coordinated effort to sell counterfeit Spectrum products on Amazon's website, thus deceiving customers, misusing the Spectrum Trademarks, depriving Plaintiff Spectrum of sales, and tarnishing the reputation of all Plaintiffs. Dkt. No. 46 ¶¶ 5–6, 28, 35–37, 45, 52. Plaintiff Spectrum's damages request is "consistent with the amounts awarded by other courts in this District for similar conduct, proportional to [Plaintiff's] actual damages, and sufficient to deter [Defendants] from further willful infringement, but is not so great as to result in a windfall for [Plaintiff]." *Li*, 2024 WL 1832466, at *8 (quoting *Dong*, 2024 WL 775900, at *8); *see also Dai*, 2023 WL 6233835, at *5 (awarding damages three times the aggregate sales of

counterfeit products in the Amazon Store); *Sirowl Tech.*, 2022 WL 19000499, at *5 (same); *White*, 2022 WL 1641423, at *5 (same).

Therefore, the Court awards Plaintiff Spectrum $4,052,979 as follows: (1) $80,112 against Defendant Ali Akdogan; (2) $32,952 against Defendant Gulcan Akdogan; (3) $3,276 against Defendant Emir Alkan; (4) $13,998 against Defendant Ismail Arslan; (5) $1,034,109 against Defendant Levent Arik; (6) $335,985 against Defendant Sahin Balut; (7) $85,644 against Defendant Enes Cankaya; (8) $32,418 against Defendant Murat Demir; (9) $21,180 against Defendant Fahriye Hascelik; (10) $14,244 against Defendant Hamidbek Jumabayev; (11) $15,465 against Defendant Ibrahim Karakaya; (12) $29,322 against Defendant Adem Omer Yilmaz; (13) $20,091 against Defendant Seyfihan Sahin; (14) $17,925 against Defendant Mustafa Unver; (15) $28,188 against Defendant Tarik Acar; (16) $172,404 against Defendant Murat Bayram; (17) $563,136 against Defendant Muhammed Fatih Buyukyildiz; (18) $3,654 against Defendant Botan Cevarun; (19) $184,668 against Defendant Ferhat Demir; (20) $77,544 against Defendant Barbaros Kambak; (21) $46,347 against Defendant Yasemin Ozturk; (22) $21,270 against Emir Safa Yolcu; (23) $402,504 against Defendants Deniz Senel and Osman Nuri Senel, jointly and severally; (24) $17,244 against Defendant Ozkan Yenihayat; (25) $57,219 against Defendant Baris Cicek; (26) $118,368 against Defendant Yinglan Lin; (27) $81,126 against Defendant Emrah Altinay; (28) $436,440 against Defendant Mete Mokan; (29) $14,313 against Defendant Enes Karatas; (30) $52,011 against Defendant Emre Unver; (31) $9,267 against Defendant Huseyin Ayaz; and (32) $30,555 against Defendant Mucahit Kaya.

**2. Actual Damages for Plaintiff Amazon Services for Breach of Contract**

In addition to statutory damages for violating the Lanham Act, Plaintiff Amazon Services also seeks actual damages against all Defendants for breach of contract and false designation of

origin. Dkt. No. 97 at 18–19.[3] "The general measure of damages for breach of contract is that the injured party is entitled to: (1) recovery of all damages that accrue naturally from the breach, and (2) to be put into as good a pecuniary position as he would have had if the contract had been performed." *Entry Select Ins. Co. v. Silver Arrow Cars, Ltd.*, No. C19-0598, 2020 WL 1847749, at *3 (W.D. Wash. Apr. 13, 2020) (citing *Diedrick v. Sch. Dist. 81*, 87 Wn.2d 598, 610, 555 P.2d 825 (1976)). Here, Plaintiff Amazon Services seeks $755,563 in actual damages that it suffered as a result of Defendants' breaches of the BSA. Dkt. No. 97 at 18–19; Dkt. No. 97-1 at 5–7.

The Court finds that Plaintiff Amazon Services' request is appropriate and just. Defendants agreed to "defend, indemnify, and hold harmless Amazon . . . against any . . . loss [or] damage . . . arising from or related to . . . [Defendants'] Products, including the . . . refund . . . thereof." Dkt. No. 46-2 at 5, 39. Plaintiff Amazon Services issued refunds to customers who had purchased counterfeit Spectrum products, in the total of $755,563 (after deducting other recovered funds). Dkt. No. 99 ¶ 5. Therefore, Plaintiff Amazon Services' damages request is consistent with the amount to which it is entitled.

Therefore, the Court AWARDS Plaintiff Amazon Services $755,563 in actual damages as follows: (1) $21,628 against Defendant Ali Akdogan; (2) $8,601 against Defendant Gulcan Akdogan; (3) $270,301 against Defendant Levent Arik; (4) $68,620 against Defendant Sahin Balut; (5) $2,049 against Defendant Murat Demir; (6) $5,323 against Defendant Fahriye Hascelik; (7) $3,176 against Defendant Hambidek Jumabayev; (8) $4,990 against Defendant Seyfihan Sahin; (9) $3,995 against Defendant Mustafa Unver; (10) $4,641 against Defendant

---

[3] Common-law breach of contract and false designation of origin under the Lanham Act each provide an independent basis for Plaintiff Amazon Services to recover actual damages. *See Rathke v. Roberts*, 33 Wn.2d 858, 866–67, 207 P.2d 716 (1949) (explaining that actual damages are appropriate remedy in breach-of-contract action); *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1111–12 (9th Cir. 2012) (discussing actual damages under the Lanham Act).

Tarik Acar; (11) $40,415 against Defendant Murat Bayram; (12) $666 against Defendant Botan Cevarun; (13) $41,489 against Defendant Ferhat Demir; (14) $1,486 against Defendants Yasemin Ozturk and Ali Burak Ozturk, jointly and severally; (15) $2,731 against Defendant Emir Safa Yolcu; (16) $98,338 against Defendants Deniz Senel and Osman Nuri Senel, jointly and severally; (17) $688 against Defendant Ozkan Yenihayat; (18) $11,358 against Defendant Baris Cicek; (19) $20,153 against Yinglan Lin;[4] (20) $19,010 against Defendant Emrah Altinay; (21) $114,430 against Defendant Mete Hokan; (22) $11,373 against Defendant Emre Unver; (23) $102 against Defendant Huseyin Ayaz.

**D. Permanent Injunction**

The Lanham Act authorizes "the 'power to grant injunctions accordingly to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right' of the trademark owner." *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1137 (9th Cir. 2006). The WCPA similarly authorizes injunctions against violations of the statute. RCW 19.86.090.

In trademark cases, courts apply "traditional equitable principles" in deciding whether to grant permanent injunctive relief. *Reno*, 452 F.3d at 1137 (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 393 (2006)). That is, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

[4] Defendant Yinglan Lin's actual damages derive from their Lanham Act violation, not their breach of the BSA. As pleaded, Plaintiff Amazon Services' breach-of-contract claim is "against Defendants in Schedule 1A." Dkt. No. 46 at 18. Defendant Yinglan Lin is listed in Schedule 2, not Schedule 1A. Dkt. No. 46 at 41. But because the Lanham Act provides for an award of actual damages against a liable defendant, this is a distinction without a difference, and the Court still assesses the same amount of actual damages.

disserved by a permanent injunction." *Id.* at 1137 n.11 (quoting *eBay*, 547 U.S. at 391). A trademark holder is entitled to a rebuttable presumption of irreparable harm upon a finding of a violation. 15 U.S.C. § 1116(a).

Here, Plaintiffs seek a permanent injunction enjoining the remaining Defendants from their infringing use of the Spectrum Trademarks. *See* Dkt. No. 97 at 19–20. Specifically, Plaintiffs seek an order permanently enjoining:

> Defendants and their officers, agents, servants, employees, and all others in active concert or participation with them, who receive actual notice of this order, . . . from:
>
> a. selling counterfeit or infringing products in Amazon's stores;
>
> b. selling counterfeit or infringing products to Amazon or any Amazon affiliate;
>
> c. importing, manufacturing, producing, distributing, circulating, offering to sell, selling, promoting, or displaying any product using any simulation, reproduction, counterfeit, copy, or colorable imitation of Spectrum Brands's brand or trademarks, or which otherwise infringes Spectrum Brands's intellectual property, in any store or in any medium; and
>
> d. assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (c) above.

Dkt. No. 97-1 at 8. Plaintiffs argue that all four *eBay* factors weigh in favor of a permanent injunction. The Court agrees.

First, Plaintiffs are entitled to a rebuttable presumption of irreparable harm, as they have alleged (and the Court accepts as true) that Defendants have committed trademark infringement and false designation of origin, among other claims. *See* 15 U.S.C. § 1116(a). Defendants present no evidence to rebut this presumption, and the Court finds no such evidence in the record.

Second, remedies at law are inadequate to compensate Plaintiffs, who have alleged harm to their reputation and goodwill. "Harm resulting from lost customer goodwill 'is neither easily calculable, nor easily compensable' and thus cannot be remedied by a monetary award." *Dong*, 2024 WL 775000, at *8 (quoting *Wong*, 2024 WL 553695, at *10). Moreover, the remaining Defendants' failure to appear "suggests that their infringing behavior may continue absent an injunction." *Id.* (citing *Wong*, 2024 WL 553695, at *10).

Third, the balance of hardships strongly favors Plaintiffs. Without an injunction, Plaintiffs may suffer further harm to their reputation through counterfeit sales. "On the other hand, because Defendants never had a right to infringe [Plaintiff Spectrum Brands'] trademark[ ] in the first place, they will suffer no harm from an injunction prohibiting unlawful infringement in the future." *Id.* at 9 (citing *Wong*, 2024 WL 553695, at *10); *see also T-Mobile USA, Inc. v. Terry*, 862 F. Supp. 2d 1121, 1133 (W.D. Wash. 2012) (holding defendants had "no legitimate interest in" continuing deceptive conduct).

Finally, a permanent injunction would serve the public interest "in protecting trademark holders' rights and minimizing the confusion caused by the presence of counterfeit products in the marketplace." *Wong*, 2024 WL 553695, at *10 (citing *Treemo, Inc. v. Flipboard, Inc.*, 53 F. Supp. 3d 1342, 1368 (W.D. Wash. 2014)).

Therefore, the Court PERMANENTLY ENJOINS the remaining Defendants on the terms requested.

## IV. CONCLUSION

Accordingly, it is hereby ORDERED:

(1) Plaintiffs' ex parte Motion for Default Judgment and Permanent Injunction Against Defendants (Dkt. No. 97) is GRANTED.

(2) Judgment is entered as to all claims, except for Amazon Plaintiffs' claim for false advertising, which is DISMISSED.

(3) Plaintiff Spectrum Brands is awarded statutory damages of **$4,052,979**, in the following amounts:

(1) $80,112 against Defendant Ali Akdogan;

(2) $32,952 against Defendant Gulcan Akdogan;

(3) $3,276 against Defendant Emir Alkan;

(4) $13,998 against Defendant Ismail Arslan;

(5) $1,034,109 against Defendant Levent Arik;

(6) $335,985 against Defendant Sahin Balut;

(7) $85,644 against Defendant Enes Cankaya;

(8) $32,418 against Defendant Murat Demir;

(9) $21,180 against Defendant Fahriye Hascelik;

(10) $14,244 against Defendant Hamidbek Jumabayev;

(11) $15,465 against Defendant Ibrahim Karakaya;

(12) $29,322 against Defendant Adem Omer Yilmaz;

(13) $20,091 against Defendant Seyfihan Sahin;

(14) $17,925 against Defendant Mustafa Unver;

(15) $28,188 against Defendant Tarik Acar;

(16) $172,404 against Defendant Murat Bayram;

(17) $563,136 against Defendant Muhammed Fatih Buyukyildiz;

(18) $3,654 against Defendant Botan Cevarun;

(19) $184,668 against Defendant Ferhat Demir;

(20) $77,544 against Defendant Barbaros Kambak;

(21) $46,347 against Defendant Yasemin Ozturk;

(22) $21,270 against Emir Safa Yolcu;

(23) $402,504 against Defendants Deniz Senel and Osman Nuri Senel, jointly and severally;

(24) $17,244 against Defendant Ozkan Yenihayat;

(25) $57,219 against Defendant Baris Cicek;

(26) $118,368 against Defendant Yinglan Lin;

(27) $81,126 against Defendant Emrah Altinay;

(28) $436,440 against Defendant Mete Mokan;

(29) $14,313 against Defendant Enes Karatas;

(30) $52,011 against Defendant Emre Unver;

(31) $9,267 against Defendant Huseyin Ayaz; and

(32) $30,555 against Defendant Mucahit Kaya.

(4) Plaintiff Amazon Services is awarded actual damages of **$755,563,** in the following amounts:

(1) $21,628 against Defendant Ali Akdogan;

(2) $8,601 against Defendant Gulcan Akdogan;

(3) $270,301 against Defendant Levent Arik;

(4) $68,620 against Defendant Sahin Balut;

(5) $2,049 against Defednant Murat Demir;

(6) $5,323 against Defendant Fahriye Hascelik;

(7) $3,176 against Defendant Hambidek Jumabayev;

(8) $4,990 against Defendant Seyfihan Sahin;

(9) $3,995 against Defendant Mustafa Unver;

(10) $4,641 against Defendant Tarik Acar;

(11) $40,415 against Defendant Murat Bayram;

(12) $666 against Defendant Botan Cevarun;

(13) $41,489 against Defendant Ferhat Demir;

(14) $1,486 against Defendants Yasemin Ozturk and Ali Burak Ozturk, jointly and severally;

(15) $2,731 against Defendant Emir Safa Yolcu;

(16) $98,338 against Defendants Deniz Senel and Osman Nuri Senel, jointly and severally;

(17) $688 against Defendant Ozkan Yenihayat;

(18) $11,358 against Defendant Baris Cicek;

(19) $20,153 against Yinglan Lin;

(20) $19,010 against Defendant Emrah Altinay;

(21) $114,430 against Defendant Mete Hokan;

(22) $11,373 against Defendant Emre Unver;

(23) $102 against Defendant Huseyin Ayaz.

(5) The remaining Defendants, their officers, agents, servants, employees, and all others in active concert or participation with them, who receive actual notice of this order, are hereby permenently ENJOINED AND RESTRAINED from:

(a) selling counterfeit or infringing products in Amazon's stores;

(b) selling counterfeit or infringing products to Amazon or any Amazon affiliate;

(c) importing, manufacturing, producing, distributing, circulating, offering to sell, selling, promoting, or displaying any product using any simulation, reproduction, counterfeit, copy, or colorable imitation of Spectrum

Brands's brand or trademarks, or which otherwise infringes Spectrum Brands's intellectual property, in any store or in any medium; and

(d) assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (c) above.

(6) The Court RETAINS jurisdiction over this case for the purpose of enforcing this Order and Injunction, and for any supplemental proceedings that may be authorized by law.

(7) Plaintiffs' counsel is DIRECTED to serve a copy of this Order and Injunction on the remaining Defendants' last known email addresses registered with Amazon, which Plaintiffs used to complete service.

Dated this 22nd day of July 2026.

Tana Lin
United States District Judge